IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **TIFFANY JONES,** | * | |
| | * | |
| Plaintiff | | |
| | * | |
| v. | | CIVIL NO. JKB-14-762 |
| | * | |
| **FAMILY HEALTH CENTERS OF BALTIMORE, INC.,** *et al.*, | * | |
| | | |
| Defendants | * | |
| | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Tiffany Jones ("Plaintiff") brought this suit against Family Health Centers of Baltimore, Inc. ("Family Health") and Ricardo Dajani (collectively, "Defendants"). Against Family Health, Plaintiff alleged sexual harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, as well as negligent hiring, training, and retention under Maryland law. Against both Defendants, Plaintiff alleged intentional infliction of emotional distress ("IIED") and battery under Maryland law. Now pending before the Court is Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 38.) The issues have been briefed (ECF Nos. 38 and 42), and no hearing is required, Local Rule 105.6 (D. Md. 2014). For the reasons explained below, Defendants' Motion will be GRANTED in part and DENIED in part.

*I. Background*[1]

---

[1] The facts and the inferences to be drawn therefrom are taken in the light most favorable to the party opposing the Motion for Summary Judgment, in this case Plaintiff. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

Plaintiff was employed as a temporary medical records scanner at Defendant Family Health from June 4, 2010, to April 27, 2011. (ECF No. 42 at 6.) Plaintiff reported to Anita Savage, the medical records lead; Savage reported to Norva Dancy-Gladden. (ECF No. 38–3 at 4-5.) Dancy-Gladden reported directly to Paula McLellan, the Chief Executive Officer ("CEO") of Family Health. (*Id.* at 15.) During this same period, Defendant Ricardo Dajani served as Chief Financial Officer ("CFO") of Family Health. Although Dajani oversaw all aspects of the organization's electronic medical records system and "in this capacity dealt with all departments," he claims to have had no supervisory authority over Plaintiff. (ECF No. 38–4 at 3.)[2]

Plaintiff alleges that, while she was employed at Family Health, Dajani harassed her on numerous occasions. The first incident occurred during a staff meeting. Plaintiff and a coworker had stepped into the lunchroom for a bagel; Dajani apparently had the same idea. (ECF No. 42 at 37.) Plaintiff and Dajani simultaneously reached for a bagel, at which point Dajani allegedly told Plaintiff that he "wouldn't mind . . . taking [her] somewhere or taking [her] away or something like that." (*Id.*) Plaintiff's coworker remarked that Dajani "gave her the creeps," but Plaintiff "didn't want to . . . make too much of a big deal out of it at the time." (*Id.*)

The next incident occurred in an office hallway. Plaintiff and Dajani were approaching one another, and Dajani allegedly blocked Plaintiff's path. (*Id.* at 38.) "[E]very way I tried to get past," Plaintiff claims, "he would . . . do this." (*Id.*) Plaintiff interpreted the incident as "a joke," and she "didn't find it . . . threatening or anything like that." (*Id.*) Plaintiff did not report the incident; however, from that point forward, Plaintiff would ask one of her coworkers to accompany her on trips to the restroom. (*Id.* at 38-39.)

---

[2] Savage stated that she did not report to Dajani "at all" (ECF No. 38–3 at 5), and she added that if Dajani had a problem with the work being done by the records scanners, he "should have gone to Norva Dancy-Gladden" (*id.* at 8). Interestingly, however, it appears that Dajani interviewed Plaintiff when she first sought employment at Family Health, and he helped her revise her resume. (ECF No. 42 at 35.)

Plaintiff further alleges that, on some number of occasions, Dajani would either enter the medical records workroom or "look through the crack of the door." (*Id.* at 40.) Uncomfortable, Plaintiff approached Savage, who gave Plaintiff permission to lock the door when she was working by herself. (*Id.*) According to Plaintiff, a coworker noted that Dajani had only started monitoring the records scanners after Plaintiff joined Family Health. (*Id.*) However, Plaintiff admits that Dajani had complained about noise problems and productivity issues among the scanners. (*Id.* at 41.) At some point after Plaintiff secured permission to lock the door, the scanners were told to begin logging their activities; thereafter, they were assigned quotas. (*Id.*)

The final incident occurred on either April 11 or April 13, 2011. (*Id.* at 62.) Dajani entered the medical records workroom to inform the employees that free kittens were available on the premises. Plaintiff stepped outside to select a kitten. (*Id.* at 43.) On her way back, as she walked through the lunchroom and toward a door that opened into the clinic's waiting room, Plaintiff felt Dajani behind her: he "got up on [her] so close, [she] felt his private parts on . . . [her] buttocks." (*Id.* at 44.) Plaintiff also felt Dajani's hand on her waist. (*Id.* at 51.) She "felt so violated and disgusted and angry," she "couldn't hold back [her] feelings." (*Id.* at 44.) She claims that a coworker, Tammy Simpson, observed the incident; that Simpson hugged her and walked her to the workroom; and that Plaintiff "couldn't stop crying." (*Id.*) Plaintiff reported the incident to Savage, who allowed her to "go home" and "get [her]self together." (*Id.* at 45.)

The next day, Savage allegedly urged Plaintiff to report the doorway incident to McLellan. (*Id.*)[3] Plaintiff twice approached McLellan, but McLellan was in meetings and was unavailable. (*Id.* at 46-47.) Plaintiff thereafter gathered her belongings and left Family Health:

---

[3] There is some inconsistency between Plaintiff's and Savage's recollections of these matters. Savage testified that she first tried to persuade Plaintiff to speak with Dancy-Gladden and Jorge Lopez, another Family Health employee; that Plaintiff insisted on speaking with McLellan; and that after Plaintiff was unsuccessful in meeting with McLellan, Savage reported the incident to Dancy-Gladden and Lopez. (ECF No. 38–3 at 12-13.)

3

she never returned. (*Id.* at 47.) Plaintiff never filed a report or met with upper management to discuss the doorway incident, although she admits that Dancy-Gladden called her several days later and asked for a meeting. (*Id.* at 48.) Savage avers that she also attempted to set up a meeting between Plaintiff and Dancy-Gladden, but the meeting never took place. (ECF No. 38–3 at 13.) Although Family Health stated in an interrogatory that it was "not able to conduct an investigation because Plaintiff refused to return to work and provide any details" (ECF No. 38–2 at 3), it appears that the organization did attempt at least an initial inquiry: Jorge Lopez[4] discussed the doorway incident with Simpson (ECF No. 38–3 at 14), and Dajani "spoke with and prepared a response to . . . Lopez regarding the allegations" (ECF No. 38–4 at 2). Dajani avers that he "did not discriminate or harass the Plaintiff." (*Id.*)

Due to her "whole experience" at Family Health, Plaintiff claims to have suffered depression, and she alleges that she was on medication for some time. (ECF No. 42 at 53-55.) Plaintiff acknowledges, however, that she experienced a series of hardships in and around 2011, including the violent death of her aunt and shakeups in her living situation.[5] In either 2011 or 2012, Plaintiff took a job at Baltimore City Child Support; however, she soon left that position as she was "going through a lot with this case and . . . [her] son and it was just too much." (*Id.* at 58-59.) In mid-2013, Plaintiff began providing childcare in her home. (*Id.* at 60.)

Plaintiff filed a charge with the Equal Employment Opportunity Commission, alleging that Dajani's conduct constituted unlawful discrimination. She then filed this action on March 12, 2014, stating claims against both Family Health and Dajani. (ECF No. 1.) Defendants

---

[4] The Court assumes that Lopez worked in human resources, although his title is not mentioned in the record.
[5] Plaintiff's son and her boyfriend moved in and out of her home in 2011. (ECF No. 42 at 55-56.) Plaintiff discussed these destabilizing experiences with a therapist; the two also discussed "a lot of death in [her] family" and how the pattern of death made her feel "kind of . . . numb." (*Id.* at 56.)

4

jointly moved for summary judgment on March 23, 2015 (ECF No. 38), and Plaintiff responded on April 24, 2015 (ECF No. 42).

## II. Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of her case as to which she would have the burden of proof. *Celotex Corp.*, 477 U.S. at 322-23. The "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). As the Fourth Circuit has recognized, district courts have an "affirmative obligation . . . to prevent 'factually unsupported claims [or] defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323-24).

The facts themselves, and the inferences to be drawn therefrom, must be viewed in the light most favorable to the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). Even so, the opponent may not rest upon the mere allegations or denials of her pleading but must instead, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits must be made on personal knowledge with such facts as would be admissible in evidence and must affirmatively show the competence of the affiant to testify to the matters stated therein. Fed. R. Civ. P. 56(c)(4).

## III. Analysis

### A. Count I (Title VII)

In her first count, Plaintiff alleges that Dajani's acts constituted sexual harassment imputable to Family Health under Title VII. Title VII makes it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a). As the Supreme Court held in *Meritor Savings Bank, FSB v. Vinson*, "the language of Title VII is not limited to 'economic' or 'tangible' discrimination," but rather "evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment." 477 U.S. 57, 64 (1986) (quoting *City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978)). Thus, when the "workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor*, 477 U.S. at 65, 67).

To establish a claim for sexual harassment in the workplace, a plaintiff must prove that the conduct at issue "(1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment . . . and (4) was imputable to her employer." *Williams v. Silver Spring Volunteer Fire Dep't*, Civ. No. GJH-13-2514, 2015 WL 237146, at *8 (D. Md. Jan. 16, 2015) (quoting *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003)). Simple teasing and offhand comments will not render a workplace actionably hostile. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Even so, an "'isolated incident[]' of harassment can 'amount to discriminatory changes in the terms and conditions of employment,' if that incident is 'extremely serious.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (alteration in original) (quoting *Faragher*, 524 U.S. at 788).

Assuming without deciding that the first two incidents here—the lunchroom comment and the hallway encounter—were (1) unwelcome and (2) based on Plaintiff's sex, the Court easily concludes that such fleeting occurrences fall short of the severe/pervasive standard. As for the workroom monitoring, the parties proffer conflicting theories: a reasonable jury could find that Dajani was observing scanner productivity or, alternatively, spying on Plaintiff. But even granting Plaintiff the benefit of the doubt at the summary judgment stage, the Court still finds that such conduct was neither severe nor pervasive within the meaning of Title VII jurisprudence.

The doorway incident is a different matter. Plaintiff here alleges that Dajani "intentionally positioned his body in close proximity to that of the Plaintiff"—that he was so close, in fact, that he "bumped into the Plaintiff while she was walking, forcing the Plaintiff to feel his genitals rub up on her buttocks." (ECF No. 42 at 21.) In her deposition, Plaintiff added that she could feel Dajani's hand on her waist. (*Id.* at 51.) These are serious charges of uninvited sexual contact—and the record is troublingly devoid of evidence tending to disprove them. There is no third-party eyewitness testimony, and while Dajani conclusively asserted in an interrogatory that he "did not discriminate or harass the Plaintiff" (ECF No. 38–4 at 2), he provided no details about what actually transpired between them.

The Court is aware that some older cases suggest isolated instances of unwelcome physical contact may be insufficient to satisfy the severe/pervasive prong of a harassment claim. But in its recent *Boyer-Liberto* opinion, the Fourth Circuit altered the landscape of hostile work environment litigation. *Boyer-Liberto* held that a reasonable jury could find a supervisor's two uses of an odious slur ("porch monkey"), directed toward the plaintiff during a single workplace conflict, severe enough to engender a hostile work environment. 786 F.3d at 280-81. If isolated uses of an offensive epithet can render a workplace hostile, the Court concludes that unwanted

sexual contact can do so as well.[6] *Cf. Williams*, 2015 WL 237146, at *9 (suggesting that a reasonable jury could find a single incident, in which a supervisor "straddled and grinded" on the plaintiff's lap in the presence of her colleagues, "so degrading and humiliating that it satisfies the severe or pervasive" prong). Mindful that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," *Anderson*, 477 U.S. at 255, the Court cannot at this stage rule out the possibility that Dajani's conduct created a hostile work environment for Plaintiff.

Of course, even if Plaintiff's work environment was hostile, there remains the separate matter of imputation to Family Health. In general, an employer is liable for coworker harassment only if the employer was "negligent with respect to the offensive behavior." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013). Where the harassing employee is the plaintiff's *supervisor*, however, the employer is vicariously liable unless the employer satisfies the so-called *Faragher-Ellerth* affirmative defense.[7] Specifically, the employer must show "(1) that it exercised reasonable care to prevent *and* promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided." *Id.* at 2442 (emphasis added). In the Fourth Circuit, distribution of an anti-harassment policy is "compelling proof" that a company has exercised reasonable care in preventing and correcting harassment: the only way to rebut such proof is to show that the policy was adopted in bad faith or was otherwise defective or dysfunctional. *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 266 (4th Cir. 2001).

---

[6] While the other incidents described in Plaintiff's Complaint would not trigger Title VII liability on their own, a reasonable jury could certainly take them into account when evaluating the April 2011 incident. *Cf. Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 197 (4th Cir. 2000) (where the "more serious incidents enumerated" were "complemented by numerous additional occurrences that, in isolation, may have seemed less problematic," those additional incidents "actually served to exacerbate the severity of the situation").

[7] An employer is also vicariously liable where the harassing supervisor takes a "tangible employment action," such as termination or failure to promote. *Vance*, 133 S. Ct. at 2442. There is no evidence of any such tangible action in this case.

The parties dispute whether Dajani exercised supervisory authority over Plaintiff, and there is some evidence cutting in both directions.[8] Viewing the facts in the light most favorable to Plaintiff, the Court assumes without deciding that he was a "supervisor" for Title VII purposes.[9] Assuming further that Dajani created a hostile work environment, Family Health would be liable for that hostility unless it could satisfy the two-prong *Faragher-Ellerth* defense.

As to the second prong, the Court suspects (but does not hold) that Plaintiff "unreasonably failed to take advantage of . . . corrective opportunities," *Vance*, 133 S. Ct. at 2442. While Plaintiff notified her team leader about the doorway incident, she refused requests by that leader and by her second-line supervisor to come in for a meeting to "tell her side of what had happened." (ECF No. 38–3 at 13.)  And while Plaintiff twice attempted to meet spontaneously with the CEO, she apparently made no effort to schedule an appointment. Given the seriousness of Plaintiff's accusation, a reasonable person in her position would have understood the importance of aiding the investigation. *See Barrett*, 240 F.3d at 268 ("[T]he law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a *concerted effort* to inform the employer that a problem exists." (alteration in original) (emphasis added) (quoting *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir 1999)).[10]

As to the first prong, however, there is an evidentiary problem. While dissemination of an anti-harassment policy is "compelling proof" of reasonable care, *Barrett*, 240 F.3d at 266, and while Family Health avers that it maintains such a policy (ECF No. 38–2 at 4), there is no proof

---

[8] *See supra* note 2 and accompanying text.

[9] In *Vance*, the Supreme Court clarified that an employee qualifies as a supervisor for Title VII purposes only if he or she is "empowered by the employer to take tangible employment actions against the victim." 133 S. Ct. at 2439.

[10] However, as discussed immediately below, the summary judgment record does not include a copy of the employee handbook or relevant provisions therein, and the Court cannot speculate as to the exact parameters of Family Health's reporting policy *as it was conveyed to Plaintiff*. It is possible, therefore, that by reporting to Savage, Plaintiff satisfied her obligation under the policy. A fuller evidentiary record at trial may resolve this ambiguity.

in the summary judgment record that Plaintiff received or reviewed that policy. There is evidence that Plaintiff received a copy of the employee handbook (ECF No. 38–6), and Defendants' memorandum takes care to explain that the "handbook discusses and prohibits sexual harassment and . . . describes the Defendant's reporting requirement" (ECF No. 38–1 at 16). Yet that assertion is unaccompanied by a citation to the record—presumably because the record includes neither a copy of the handbook *nor even a relevant excerpt*. Nor did defense counsel ask Plaintiff a single question on deposition concerning whether she received, reviewed, or otherwise understood the policy.[11]

Family Health has thus asked the Court to find that it qualifies for an affirmative defense absolving it of Title VII liability, yet it has failed to produce a critical piece of evidence that would assist the Court in making such a finding. In all likelihood Plaintiff did receive a copy of the anti-harassment policy: in fact, she does not even contest this point in her own memorandum. But the Court will not seal gaps in the summary judgment record with judicial caulk. And since Family Health proffers no separate evidence of harassment-prevention efforts, it cannot prevail on the *Faragher-Ellerth* defense, at least not at this stage. Consequently, the Court will deny summary judgment to Family Health on Count I.[12]

### B. *Count II (Negligent Hiring, Training, and Retention)*

In her second count, Plaintiff alleges that Family Health was negligent in placing Dajani in a position of authority, since it knew or should have known of Dajani's "propensity to sexually harass female employees." (ECF No. 1 at 7.) She adds that Family Health was negligent in retaining Dajani, and that the organization negligently failed to train its employees on its harassment policy. (*Id.*)

---

[11] For that matter, there is no evidence that Dajani received, reviewed, or understood the policy.
[12] In so doing, the Court takes no position as to whether Family Health might ultimately prevail on the affirmative defense at trial.

The Court of Appeals of Maryland has long recognized that employers must exercise reasonable care in the selection and retention of their employees. "[T]he tort of negligent selection, training, or retention, like any negligence action, requires the plaintiff to prove the existence of four elements: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff suffered actual injury; and (4) the injury proximately resulted from the defendant's breach." *Jones v. State*, 38 A.3d 333, 343 (Md. 2012).

The parties here do not engage with these elements in their memoranda. In fact, they make only passing reference to Plaintiff's negligence claims. Defendants suggest that these claims must be dismissed once the other counts are dismissed (ECF No. 38–1 at 23); Plaintiff responds that the claims are "viable in light of the evidence of Dajani's actions, and Family Health Center's inaction" (ECF No. 42 at 3).

A review of the record, however, exposes a dearth of evidence corresponding to Plaintiff's negligence theory. Assuming that Dajani's behavior was improper, there is no indication that Family Health was on actual or constructive notice of such impropriety when it hired him. There is also no indication that any other Family Health employee complained about Dajani: in fact, Savage averred that she never heard any other reports about harassment, sexual or otherwise. (ECF No. 38–3 at 10.) As for retention, Dajani no longer serves as CFO (ECF No. 38–1 at 1), though his present employment situation is unclear. And as for training, there is simply no evidence regarding the extent to which Family Health employees were (or were not) trained on how to investigate harassment claims.

While Defendants bear the burden at this stage of showing that there is no genuine dispute as to any material fact, it remains Plaintiff's burden to produce a "forecast of evidence to support each element of her claims upon which she has the burden of proof." *Green v. Wills*

*Grp., Inc.*, 161 F. Supp. 2d 618, 627 (D. Md. 2001) (granting summary judgment to defendant on negligent hiring and supervision claims where plaintiff "merely argue[d] that all facts [we]re in dispute"). Plaintiff's failure to produce such a forecast here is fatal to her negligence theory, and so the Court will grant summary judgment to Family Health on Count II.

### C. Count III (IIED)

In her third count, Plaintiff alleges that Dajani's acts caused her "severe emotional distress and mental anguish." (ECF No. 1 at 8.) She seeks to impose IIED liability on Dajani directly and Family Health vicariously.

Under Maryland law, an employer may be held vicariously liable for the tortious acts of its employees where such acts occur within the scope of employment—in other words, "when the conduct is in furtherance of the business of the employer and is authorized by the employer." *Tall v. Bd. of Sch. Comm'rs*, 706 A.2d 659, 667 (Md. Ct. Spec. App. 1998); *see also Antonio v. SSA Sec., Inc.*, 110 A.3d 654, 658-59 (Md. 2015) ("The common law doctrine of *respondeat superior* not only holds employers liable for the actions of their employees in furtherance of the employer's business, *but also limits an employer's liability to those situations*. It is central to the doctrine that an employee's acts committed outside the scope of employment, *i.e.*, not in the furtherance of the employer's business, are not attributable to the employer." (emphasis added)).[13] There is no evidence in the summary judgment record that Dajani's acts furthered Family Health's business interests or were otherwise authorized by the organization. Plaintiff's vicarious liability theory must therefore fail.

---

[13] Plaintiff insists that "acts committed within the scope of employment are not the only basis for imposing employer liability." (ECF No. 42 at 16.) But the cases she cites to support this proposition—*Faragher*, 524 U.S. 775; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343 (4th Cir. 1995)—do not purport to construe Maryland law. Rather, these are Title VII cases. Courts have long held employers vicariously liable under Title VII for harassment (sexual or otherwise) in the workplace. But imputation under Title VII and *respondeat superior* under Maryland law involve separate inquiries.

Plaintiff's theory fails for a more basic reason as well: she has not shown that Dajani's acts rose to the level of IIED. Recovery under IIED is "meted out sparingly" in Maryland, its "balm reserved for those wounds that are truly severe and incapable of healing themselves." *Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1065 (Md. Ct. Spec. App. 1986). Four elements must coalesce before liability can be imposed: (1) the conduct at issue must be intentional or reckless, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the conduct and the plaintiff's emotional distress, and (4) such distress must be severe. *Id.* at 1063. Conduct that is merely rude, insensitive, or callous will not satisfy the "extreme and outrageous" prong; rather, the conduct must "completely violate human dignity," threatening to "shatter the frame upon which one's emotional fabric is hung." *Id.* at 1064. As for the resulting distress, it must be "so acute that no reasonable person could be expected to endure" it, and it must leave one "unable to function" and "unable to tend to necessary matters." *Id.* Given these stringent requirements, it comes as no surprise that IIED is "rarely viable" in Maryland. *Farasat v. Paulikas*, 32 F. Supp. 2d 244, 247 (D. Md. 1997), *aff'd*, 166 F.3d 1208 (4th Cir. 1998).

Construing the facts in the light most favorable to Plaintiff, no reasonable jury could find that Dajani's conduct "completely violate[d] human dignity," *Hamilton*, 502 A.2d at 1064. Dajani allegedly (1) made an inappropriate remark on one occasion, (2) blocked Plaintiff's path on another occasion, (3) monitored Plaintiff while she was working, and (4) bumped into Plaintiff in a doorway. Even assuming that the doorway incident was intentional and boorish, such an act falls short of extreme and outrageous conduct under Maryland law. *See, e.g.*, *Thomas v. Bet Sound-Stage Rest.*, 61 F. Supp. 2d 448 (D. Md. 1999) (no IIED where defendant groped plaintiff and "yanked" down her pants); *Branch v. McGeeney*, 718 A.2d 631 (Md. Ct.

Spec. App. 1998) (no IIED where police officers forced nine-year-old child to her knees and cuffed her); *Continental Cas. Co. v. Mirabile*, 449 A.2d 1176 (Md. Ct. Spec. App. 1982) (no IIED where defendant tapped plaintiff's nose, repeatedly pushed him, and grabbed his arm).

Moreover, no reasonable jury could find that Plaintiff experienced unbearably acute distress traceable to Dajani's conduct. Plaintiff claims to have suffered depression as a result of her "whole experience" at Family Health, and she took some unspecified medication for an indeterminate period; she also left a job at Baltimore City Child Support due to her "emotional issues." (ECF No. 42 at 53, 55, 59). Plaintiff notes, however that she was "going through a lot with this case and . . . [her] son." (*Id.* at 59.) She also admits to having spoken with her therapist about a series of troubling events, including disruptions in her household, the murder of her aunt, and other premature deaths in her family. (*Id.* at 56.) At most, a jury might find that Plaintiff's experience at Family Health was one of several factors affecting her state of mind.

Significantly, Plaintiff nowhere demonstrates that she was left "unable to function" or "unable to tend to necessary matters," *Hamilton*, 502 A.2d at 1064, in the wake of her employment at Family Health. Without "evidentiary particulars," *Harris v. Jones*, 380 A.2d 611, 617 (Md. 1977), as to any physical or psychological conditions Plaintiff may have suffered from or any treatments she may have received,[14] the record does not show that Plaintiff experienced actionably severe distress within the meaning of the IIED tort.[15]

---

[14] In her memorandum opposing summary judgment, Plaintiff alleges that she sought treatment for "emotional distress and psychological trauma" at the University of Maryland Medical Center and Mosaic Behavioral Health. (ECF No. 42 at 23.) However, these facilities are nowhere referenced in the evidentiary record, and the Court cannot speculate as to the details or duration of Plaintiff's alleged treatment. The record does show that Plaintiff made regular visits to a clinic—but these visits pertained to an unrelated blood disorder. (*Id.* at 52.)

[15] For that matter, Maryland courts have sometimes declined to impose IIED liability even in cases in which plaintiffs have presented evidence of specific physical symptoms. *See, e.g.*, *Harris*, 380 A.2d 611 (insufficient distress where plaintiff's speech impediment worsened and he obtained pills "for his nerves"); *Carter v. Aramark Sports & Entm't Servs., Inc.*, 835 A.2d 262 (Md. Ct. Spec. App. 2003) (insufficient distress where plaintiff was diagnosed with moderate depression and depressive headaches); *Moniodis v. Cook*, 494 A.2d 212 (Md. Ct. Spec.

Because Dajani's acts were not extreme and outrageous, and because Plaintiff did not experience severe distress, the Court will grant summary judgment to Defendants on Count III.

### D. Count IV (Battery)

In her fourth count, Plaintiff alleges that the doorway incident constituted a battery. She seeks to recover from Dajani directly and Family Health vicariously. (ECF No. 1 at 10.)

Under Maryland law, a battery is "an offensive, non-consensual touching—the 'unlawful application of force to the person of another.'" *Robinson v. Prince George's Cnty.*, Civ. No. PJM-09-181, 2011 WL 1743263, at *6 (D. Md. May 6, 2011) (quoting *Katsenelenbogen v. Katsenelenbogen*, 775 A.2d 1249, 1254 n.1 (Md. 2001)), *aff'd*, 465 F. App'x 238 (4th Cir. 2012). Battery is an intentional tort: although a "purely accidental touching, or one caused by mere inadvertence, is not enough to establish the intent requirement for battery, *Nelson v. Carroll*, 735 A.2d 1096, 1100 (Md. 1999), intent is "broader than a desire or purpose to bring about physical results. It extends not only to those consequences which are desired, but also to those which the actor believes are substantially certain to follow from what the actor does." *Johnson v. Mountaire Farms of Delmarva, Inc.*, 503 A.2d 708, 712 (Md. 1986) (quoting *Prosser and Keeton on Torts* § 8 (W. Page Keeton et al. eds., 5th ed. 1984)).

Just as Plaintiff's vicarious liability theory for IIED failed, that theory must fail here as well. There is no evidence that Dajani's alleged battery either furthered Family Health's business interests or was authorized by the organization. *Cf. Green*, 161 F. Supp. 2d at 626 ("[U]nder Maryland law, an employer is not vicariously liable for the torts of assault and battery based on sexual assaults by another employee as they are outside the scope of employment.").

---

App. 1985) (insufficient distress where plaintiffs lost sleep and developed hives), *superseded by statute on other grounds*.

As for Dajani, however, Plaintiff has stated a claim for battery and supported that claim with some evidence, *i.e.*, her deposition testimony that Dajani "got up on [her] so close, [she] felt his private parts on . . . [her] buttocks." (ECF No. 42 at 44.) A reasonable jury could interpret this incident as Defendants have characterized it in their memorandum, *i.e.*, an "incidental contact that occurs from time to time regardless of the sex of the parties." (ECF No. 38–1 at 13.) But an equally reasonable jury could conclude that the contact was intentional, particularly given the broad definition of intent under Maryland tort law. The Court cannot resolve this tension at the summary judgment stage, and so Plaintiff's battery claim against Dajani must proceed to trial.

Accordingly, the Court will grant summary judgment to Family Health but deny summary judgment to Dajani on Count IV.

## IV. Conclusion

For the foregoing reasons, an order shall enter GRANTING in part and DENYING in part Defendants' Motion for Summary Judgment.

DATED this 28th day of September, 2015.

BY THE COURT:

/s/
James K. Bredar
United States District Judge